COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Decker, Judges Malveaux and Raphael
Argued at Williamsburg, Virginia


BRIAN F. FORD, IN HIS DERIVATIVE CAPACITY,
 ON BEHALF OF FORD'S COLONY REALTY, LLC AND
 SOUTHEAST SETTLEMENT & TITLE COMPANY, LLC,
 ET AL.
                                                        MEMORANDUM OPINION* BY
v.        Record No. 1803-23-1                          JUDGE STUART A. RAPHAEL
                                                              FEBRUARY 11, 2025
MICHAEL J. TIERNAN


FROM THE CIRCUIT COURT OF THE CITY OF WILLIAMSBURG
AND COUNTY OF JAMES CITY
Charles J. Maxfield, Judge Designate

        S.M. Franck (Geddy, Harris, Franck & Hickman, L.L.P., on briefs),
        for appellants.

        W. Hunter Old (Hunter Old Law PLLC, on brief), for appellee.


        The plaintiffs-appellants are (or were) closely held companies owned principally by

members of the Richard Ford family.  They argue here that defendant-appellee Michael J.

Tiernan misappropriated funds while managing those companies.  At the bench trial below,

neither side offered any expert forensic-accounting testimony to explain the complex financial

transactions at issue.  In the end, the trial court found Tiernan's testimony credible and

concluded that the plaintiffs had failed to prove their claims.  The court also found (among other

things) that Richard's son, Brian F. Ford, could not properly bring derivative claims on behalf of

two of the companies after their dissolution.  So the court not only granted Tiernan's motion to

strike at the close of all evidence but also found in his favor on the merits.  Seeing no reversible

_____

        * This opinion is not designated for publication.  *See* Code § 17.1-413(A).

error in the trial court's merits ruling, we affirm the judgment on that basis without reaching the more difficult legal questions posed by the derivative claims.

BACKGROUND

This case centers around Ford's Colony, a subdivision development in Williamsburg that Richard Ford started through three corporations. Over time, the corporate structure ballooned into many different limited-liability companies ("LLCs"). The four companies at issue here are Southeast Settlement and Title Company, LLC ("SES"), Ford's Colony Realty, LLC ("FCR"), RCS Williamsburg Holdings, LLC ("RCS"), and FCD, LLC ("FCD").

Ford's Colony was a family affair. Richard and his four children co-owned one of the corporations. Brian Ford and Dorothea Ford (Richard's wife) were members in most of the LLCs. Brian's wife worked at the Ford's Colony country club and as a real estate agent for FCR. Brian's brother did financial work for the companies. Brian's sister was at least financially involved in the companies. Another of Brian's sisters worked as a sales manager in a development project in North Carolina. And nine Ford grandchildren were involved in Ford Cousins, LLC. As the trial court put it, "[t]his extended corporate structure was supporting the whole Ford family."

But not all of the central players were family. Michael Tiernan first worked for Richard as an assistant treasurer. He later managed the country club at Ford's Colony. When the country club went under in 2009, Tiernan guided it through bankruptcy and helped Richard negotiate his way out of $80 million in personal guarantees. Tiernan and Richard developed a close personal relationship, and Tiernan became Richard's "fixer." Tiernan assumed a prime position in the various LLCs. He was not only a member but the manager of SES, FCR, FCD, and RCS.

When the companies' financial position did not improve, however, the members (including Brian, Dorothea, and Tiernan) were forced to lend money to the companies to keep

them afloat. The members entered into an agreement earmarking "builder fees" as security for their loans. The builder fees consisted of 3% of the improvement value of all homes built in Ford's Colony. Different companies collected the fees at different times, but RCS took over the collection in 2012. Still, the companies' finances did not recover. Tiernan and Brian agreed in 2015 to stop drawing salaries. And the businesses continued to depend on loans from the members.

In 2017, recognizing the severity of the financial situation, Brian and Tiernan arranged for the assets of SES and FCR to be sold to IDWT, LLC, an unrelated company owned by David Walker. Brian, Tiernan, and Dorothea also transferred to IDWT their 100% membership interest in RCS. IDWT retained control of RCS and owned its right to collect builder fees; all other assets were to be transferred to FCD. In July 2017, the State Corporation Commission approved articles of cancellation terminating the existence of FCR and SES.

In 2018, a chance discovery of an overdraft on an FCR bank account revealed to Brian that Tiernan, since 2015, had been writing company checks to himself. Brian knew that Tiernan was owed loan repayments, but by Brian's math, Tiernan had overpaid himself by hundreds of thousands of dollars. Some of those moneys, Brian believed, came from loans that Brian or Dorothea had made to the companies. Brian reviewed the bank records to investigate his suspicions. For his part, Tiernan did not dispute taking the money. But he maintained that, as the companies' manager, he had the right—without asking anyone's permission—to reimburse himself for expenses, to repay loans he had made, and to take a salary.

This litigation started in January 2019. Brian (in his individual capacity and derivative capacity for SES and FCR), Dorothea Ford, and FCD (as the assignee of RCS's claim against Tiernan) sued Tiernan to recover the money they claimed Tiernan had misappropriated. Without objection, the court ultimately dismissed Dorothea and Brian as plaintiffs to the extent they

- 3 -

brought their claims in their individual capacities.  So the only plaintiffs-appellants remaining here are Brian (in his derivative capacity for SES and FCR), and FCD (as assignee of RCS's claim against Tiernan).[1]

The case faced more than four years of delays.  The delays arose from a criminal investigation into Tiernan's activities, his filing for bankruptcy, and his criminal trial and resulting convictions.[2]

During the delay, appellants tried without success to undermine Tiernan's defense theory through a motion *in limine*.  First, they argued that Tiernan could not "disavow" his earlier statement that some portion of the money he took was for compensation by claiming that the money was instead a loan repayment.  Second, they argued that Tiernan should not be allowed to introduce evidence about payments to people outside the businesses to offset his own liability.  And third, they sought to bar him from introducing canceled checks to support his third-party-payment theory if he failed to identify those checks earlier in discovery.  The court denied the motion *in limine* "without prejudice" to making those arguments again at trial.[3]

At trial, Brian testified that Tiernan transferred RCS's builder-fee proceeds to an SES account so he could take the money for himself.  FCD's misappropriation claim against Tiernan,

---

[1] Appellants also sued IDWT, but IDWT successfully moved to bifurcate the claim against it and proceeded to trial separately on that claim.  The trial court subsequently granted a partial final judgment against IDWT, dismissed and removed IDWT as a party, and retained appellants' claims against Tiernan for trial.  The IDWT issues are not before us.

[2] The investigation into Tiernan apparently began when appellants provided his early discovery responses from this litigation to federal investigators.  Tiernan was ultimately charged with seven counts of bank fraud (related to seven of the same checks at issue here), two counts of filing false tax returns, and one count of not filing an income-tax return.  After a five-day trial, Tiernan was convicted on the tax crimes but acquitted on the bank-fraud charges.

[3] The record does not contain the hearing transcript and does not disclose the trial court's rationale.  A later order denied a second motion *in limine*, but that motion is not in the record and the details are unclear.

Brian explained, derived from RCS's claim, which was assigned to FCD in the asset purchase agreement. Similarly, SES's claim arose from Tiernan taking funds from that company's account.

To prove their damages, appellants introduced into evidence hundreds of canceled checks that were drawn against company accounts, as well as summaries of data from those checks. The summaries showed a total of $291,100 taken by Tiernan from FCR, $106,000 from SES as compensation, and $290,352.83 from SES for loan repayments, for a total of $687,452.83.

On cross-examination, Tiernan questioned Brian about payments made by the businesses to third parties, the same line of questioning appellants had sought to restrict in their motion *in limine*. Those payments included checks for Richard's vehicle, Brian's two vehicles, a disability-insurance policy for Brian, a sister's credit card bills, and Dorothea's trust. Appellants renewed their objections from the motion *in limine*. Tiernan responded that this line of questioning showed why he was owed additional money. The court overruled appellants' objections.

Appellants never offered proof of the total amount Tiernan was owed. Plaintiffs' Exhibit 12, a centerpiece of their case, tracked only loans before 2009. The parties agreed that at least some loans from members were not included in that exhibit.

At the close of the plaintiffs' case-in-chief, Tiernan moved to strike several claims. First, he argued that the derivative claims should be dismissed for failure to make demand on the LLCs, as required by Code § 13.1-1042. Appellants countered that such demand would have been futile because they would have been asking Tiernan to sue himself. Tiernan disagreed, arguing that demand should have gone to Brian or Dorothea since they were responsible for winding up the companies' affairs and had effectively removed Tiernan as manager in 2018. Without ruling on those points, the court questioned whether a canceled LLC could even be

revived to pursue a derivative action. Second, Tiernan argued that FCD's claim against him should be dismissed because FCD failed to show that RCS had ever assigned it the claim. Appellants countered that the asset purchase agreement made the assignment to FCD self-executing without further action.

The court took the motions to strike under advisement and continued with the trial. Over appellants' objection, Tiernan testified at length to explain the financial transactions. Relying on the Ford family members' discovery responses, Tiernan showed the moneys they had loaned to the companies and how much had been repaid. By Tiernan's calculations, Brian and Dorothea had both been overpaid, while Tiernan was still owed money. Tiernan claimed that the checks he had written to himself were in partial payment of what he was owed.

Part of his testimony addressed a $150,000 payment from FCR to Tiernan. Tiernan originally classified that transaction as a loan repayment. At trial, however, he said it was more like a gift from Dorothea for helping her sell non-business-related land. Tiernan explained that Brian had also received $150,000 after assisting in that sale. Appellants tried to rebut that claim, arguing that contemporaneous emails showed that Tiernan and Brian both considered the transfer to be a loan repayment, not a gift from Dorothea.

Appellants also tried through cross-examination to show that Tiernan destroyed or at least mishandled the financial records of SES, FCR, and RCS. But Tiernan denied doing so. He testified that a computer-based general ledger had remained under appellants' control even after the computer was sold to IDWT under the asset purchase agreement. Tiernan also denied destroying any paper records. He said that those records were transferred to IDWT under the asset purchase agreement and were either "pitched" by IDWT or remained in storage at an IDWT warehouse.

In appellants' rebuttal case, Brian testified that he believed that Tiernan's financial analysis was incorrect. For instance, although Brian had discussed a $250,000 number during his deposition, that was Brian's outstanding loan balance, not the total balance of all his loans as Tiernan had described. But Brian conceded that he had "guesstimated" that balance the day after telling the court that he did not know if anyone had any outstanding loans.

The trial court rendered judgment for Tiernan, not only granting his renewed motion to strike but also entering judgment in his favor on the merits of all claims. The court recounted that it had "heard two wildly divergent stories. One of malicious theft and coverup. The other of a family business superficially conducted through various corporations in a sloppy manner." The court credited the second version. It found that "the Ford family set up multiple corporations, ignored corporate structure, moved money around at their convenience to cover family debts . . . but are now trying to stand on the strict corporate structure argument after ignoring that structure for years."

The court found that Brian "knew very little about the financial interworking of the companies," while Tiernan "came across as credible," despite having changed his story along the way. The court concluded that appellants' claims were "cherry-picked" from various documents while Tiernan's analysis "was as persuasive as anything else in this case." The court credited Tiernan's claim about the $150,000 "gift" from Dorothea, as the land sale seemed to be completely unrelated to the companies. Returning to the motions to strike, the court found that appellants had no viable claims. The court concluded that a derivative action was not the correct procedure once the LLCs themselves had been canceled; the suit should have been brought by the members on behalf of the companies in dissolution. And FCD's claim against Tiernan failed because RCS had never assigned that claim to FCD.

Explaining its dual rulings, the trial court decided to "grant the motion to strike, but . . . also grant judgment to the defendant on the merits of the case. [The court] found that the defendant's explanation of all of this sloppy business [was] more persuasive than that presented by the plaintiff." Appellants noted a timely appeal.

ANALYSIS

Appellants have assigned three errors to the trial court's granting the motion to strike and five errors to its ruling for Tiernan on the merits. Appellants' counsel acknowledged at oral argument that they must prevail on all eight assignments to win reversal. "Given the large number of issues presented here, we look for the best and *fewest* grounds on which to resolve this appeal." *Theologis v. Weiler*, 76 Va. App. 596, 603 (2023).

With judicial restraint in mind, we affirm the judgment on the ground that the trial court's finding that appellants failed to prove their misappropriation and breach-of-fiduciary duty claims was not plainly wrong or without evidence to support it.[4] That conclusion provides the best and narrowest ground for decision. By contrast, two of the legal questions raised in the motions to strike present issues of first impression in Virginia: whether and how a former member can bring a derivative action on behalf of an LLC that has been canceled, and if a derivative action is viable, upon whom should demand be made under Code § 13.1-1042.[5] Those questions are best reserved until the Court is required to answer them.

---

[4] We find no merit in appellants' claim that the trial judge granted the motion to strike without also ruling for Tiernan independently on the merits. The court ruled from the bench that "I'm going to grant the motion to strike, but I'm also going to grant judgment to the defendant on the merits of the case." And the final order did just that. After granting the motions to strike, the final order provided, "Additionally and specifically, for the reasons set forth in the Court's remarks from the bench, . . . the Court granted JUDGMENT FOR THE DEFENDANT."

[5] *See Agnew v. United Leasing Corp.*, 80 Va. App. 612, 630 (2024) ("Code § 13.1-1050.5 . . . allows cancelled LLCs, their members, and their managers to litigate suits concerning the LLC's rights, claims, or liabilities that predate its cancellation."), *petition for appeal denied*, No. 240579 (Va. Nov. 1, 2024) (order); Code § 13.1-1042(B) ("No member may commence a

A. *The court did not err in letting Tiernan testify about the companies' finances (Assignment of Error 7).*

Appellants' various attacks on the trial court's merits ruling depend on their central claim that Tiernan should not have been allowed to testify at trial about the various financial transactions at issue because he destroyed the relevant books and records of FCR, SES, and RCS. "Appellate courts review a circuit court's ruling on the admissibility of evidence under an abuse of discretion standard." *Davenport v. Util. Trailer Mfg. Co.*, 74 Va. App. 181, 206 (2022). When acting "[a]s the fact finder, the trial court determines the credibility of witnesses and the weight of their testimony; its findings, therefore, will not be disturbed on appeal unless plainly wrong or without evidence to support them." *New Kent Cnty. v. Worley Aviation*, 255 Va. 186, 195 (1998) (quoting *Bankers Credit Serv. of Vermont, Inc. v. Dorsch*, 231 Va. 273, 275 (1986)).

The trial court did not abuse its discretion in allowing Tiernan to testify about the companies' finances because the court found that Tiernan did not destroy any financial records or commit any wrongdoing in maintaining company records. The parties presented two opposing stories and the court ultimately believed Tiernan over appellants. Tiernan testified that all relevant financial records remained on a computer within Brian's control. Although appellants claimed that Tiernan destroyed the records, the court was free to disbelieve that claim and to believe Tiernan instead. We cannot say that the trial court was plainly wrong or without evidence to support its finding that Tiernan was more credible.

---

derivative proceeding until . . . [a] written demand has been made on the limited liability company to take suitable action."). *Compare, e.g.*, *Indep. Inv. Protective League v. Time, Inc.*, 406 N.E.2d 486, 488 (N.Y. 1980) ("[A] shareholder of a dissolved corporation has sufficient interest in a derivative action to satisfy the spirit of the rule requiring ownership at the commencement of the action."), *with, e.g.*, *Fisher v. Liniger*, No. 16CV30786, 2016 Colo. Dist. LEXIS 2000, at *11 (July 26, 2016) ("Delaware law establishes that since the corporation was dissolved and the pro rata share proceeds distributed, Plaintiffs are no longer shareholders . . . and do not have standing to pursue their derivative claims.").

The trial court likewise did not abuse its discretion in permitting Tiernan to testify about canceled checks that appellants had requested in discovery in 2018 but that Tiernan did not identify until 2023, just months before trial. "[A] trial court's decision to admit evidence that is not timely disclosed, rather than to impose the sanction of excluding it, will not be reversed unless the court's action amounts to an abuse of discretion." *Manchester Oaks Homeowners Ass'n v. Batt*, 284 Va. 409, 426 (2012) (quoting *Rappold v. Indiana Lumbermens Mut. Ins.*, 246 Va. 10, 15 (1993)). Where "there was neither prejudice nor surprise," we will not find an abuse of discretion. *Id.* There was no prejudice or surprise here in permitting Tiernan to testify about checks that were equally available to both sides. Appellants had the same access to those checks as Tiernan, and they based their claims on checks drawn from the same pool of evidence. In short, the trial court did not abuse its discretion in finding that appellants were neither surprised nor prejudiced by Tiernan's reliance on the later-identified checks.

B. *The court did not err in finding that appellants failed to prove their other claims (Assignments of Error 4-6, 8).*

Because the trial court could properly rely on Tiernan's credible testimony to conclude that he did not overpay himself or misappropriate funds, we reject appellants' remaining attacks on the trial court's merits ruling. Although appellants assert that the court incorrectly credited Tiernan's defense, which they say has "no legs," they offer no basis to disregard the court's finding that Tiernan's explanations were credible. The court explicitly credited Tiernan's financial analysis that he was still owed almost $50,000, while Brian and Dorothea had been overpaid by $272,389 and $1.3 million, respectively. Although appellants complain that the court allowed Tiernan to testify that Brian and Dorothea were overpaid, appellants presented no evidence to disprove Tiernan's claim. At trial, Brian only "guesstimated" that he was still owed around $250,000, but he failed to present any evidence to back up that assertion.

We are not persuaded by appellants' insistence that Tiernan's analysis was "garbage" because it included transfers to unrelated third parties. The trial court found that the "unrelated" payments reflected the companies' loose "corporate culture"—"[t]he Fords got paid" first out of the "piggybank" companies. While the trial court sitting as factfinder could have gone either way, Tiernan's testimony, which the court found credible, supported its finding that Tiernan's payments to himself were repayments for money he was owed and that the payments were fair to the Fords.

It is exceptionally difficult to litigate a case like this without expert testimony from a forensic accountant to track the transfers between related companies and to identify questionable payments. *Cf. Tyler v. Commonwealth*, 75 Va. App. 218, 239 (2022) (affirming restitution award to reimburse the victim law firm for hiring a forensic accountant because the defendant's embezzlement "had so convoluted [the firm's] records that it could not comply with IRS requirements until it fixed its books"). The parties simply presented scores of checks to the trial court, together with their own often conflicting summaries of what the checks represented. And appellants' attempts to analyze the transfers were confusing, incomplete, and ultimately unconvincing. For instance, the amended complaint alleged that Tiernan took $165,000 from FCR and $390,000 from SES, for a total of $555,000. But appellants at trial reduced their claim to $450,000. Struggling to understand the accounting, the trial court eventually concluded that appellants were seeking about $434,000. But even that figure was based on "cherry-picked" documentation from "businesses that we know were being conducted very casually." Even on appeal here, appellants' computations have kept changing.[6]

---

[6] Appellants originally claimed on brief that their damages totaled $687,952.82, which is more than they claimed in their summary sheets at trial. At oral argument, counsel corrected the brief to claim $432,775, but that figure was yet another unexplained reduction in the damages claimed below.

In short, the trial court could reasonably find from the evidence that appellants failed to prove that Tiernan misappropriated funds or breached his fiduciary duties. Although appellants bore the burden to prove that Tiernan wrongfully took their money, they failed out of the gate to show who owed what to whom. This case cried out for a forensic accountant. Because appellants failed to prove their case, the trial court properly entered judgment for Tiernan.

CONCLUSION

Assuming without deciding that appellants' claims should have survived the motions to strike, the trial court's decision to enter judgment for Tiernan on the merits was neither plainly wrong nor without evidence to support it.

*Affirmed.*